# History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress

[The following two memoranda, prepared by the Office of Legal Counsel at the request of the Attorney General, describe instances since the founding of the Republic in which officials in the Executive Branch have refused to disclose information or produce documents requested by Congress. The first memorandum, dated December 14, 1982, sets forth examples of situations in which a President has personally directed that information be withheld, relying on the doctrine of executive privilege. The second memorandum, dated January 27, 1983, documents incidents where the Attorney General or some other executive official refused to provide information or documents to Congress in situations involving law enforcement, security, or personnel investigations. . . .]

## PART I—Presidential Invocations of Executive Privilege
## Vis-à-Vis Congress

December 14, 1982

### MEMORANDUM FOR THE ATTORNEY GENERAL

This memorandum briefly describes those incidents in which a President personally directed the withholding of information from Congress.[1] Included are incidents in which a President found it necessary to withhold specific documents or information, as well as general directives of a President concerning the withholding of information from Congress.

No effort has been made to catalogue the numerous instances in which information was withheld from Congress by executive officers other than the President; nor does this survey discuss the countless examples of full disclosure by the Executive. The objective of the memorandum is neither to show how frequently the Executive Branch has refused congressional requests for information, nor to demonstrate how often an accommodation between the branches has been achieved. Rather, the memorandum seeks to show that presidentially

---

[1] Although an attempt has been made to be as thorough as possible, no claim is made that the following list is comprehensive. In this regard, we note Deputy Assistant Attorney General Mary Lawton's statement in a memorandum to Rep. William S. Moorhead, dated Apr 25, 1973.

> In response to your request . . I regret that it is not physically possible to furnish you with a comprehensive list of presidential refusals of information to Congress. To give you all of the instances of such refusals since the beginning of the Republic would require an amount of historical research which the Office of Legal Counsel lacks the resources for handling. In addition, there is a categorization problem of distinguishing the relatively few instances of exercise of Executive Privilege *per se* [*i.e* , a refusal to disclose by the President personally] from the many instances of agreed accommodations . . for nonappearance of witnesses, nondisclosure or partial disclosure.

mandated refusals to disclose information to Congress—though infrequent—are by no means unprecedented acts of this or any other Administration.

## 1. Washington Administration

*St. Clair Incident*

On March 27, 1792, the House of Representatives established a congressional committee to investigate the failure of General St. Clair's military expedition against the Indians. The House authorized the committee "to call for such persons, papers, and records, as may be necessary to assist their inquiries."[2]

The committee subsequently asked the President for those papers pertaining to the St. Clair campaign. Since this was the first occasion in which Congress had established a committee to investigate the performance of the Executive and had authorized it to request documents from the President, and wishing "that so far as it should become a precedent, it should be rightly conducted,"[3] President Washington held a meeting with his Cabinet, attended by Jefferson, Hamilton, Randolph and Knox. Jefferson described the conclusions reached by the Nation's first Cabinet:

> We had all considered, and were of one mind, first, that the House was an inquest, and therefore might institute inquiries. Second, that it might call for papers generally. *Third, that the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public: consequently were to exercise a discretion.* Fourth, that neither the committees nor House had a right to call on the Head of a Department, who and whose papers were under the President alone; but that the committee should instruct their chairman to move the House to address the President.[4]

Although the Cabinet "agreed in this case, that there was not a paper which might not be properly produced,"[5] the President apparently felt it advisable nevertheless to negotiate with Congress a non-confrontational resolution of the problem. Jefferson thereupon agreed to speak individually to members of the House committee in order to "bring them by persuasion into the right channel."[6] Jefferson's conciliation efforts were successful, for on April 4, 1792, the House resolved,

> that the President of the United States be requested to cause the proper officers to lay before this House *such papers of a public*

---

[2] 3 Annals of Cong. 493 (1792)

[3] 1 The Writings of Thomas Jefferson 303 (Lipscomb ed , 1905).

[4] *Id.* at 303–04 (emphasis added)

[5] *Id.* at 305.

[6] *Id. See generally* Younger, *"Congressional Investigations and Executive Secrecy. A Study in the Separation of Powers,"* 20 U Pitt L Rev. 755, 757 (1959).

*nature,* in the Executive Department, as may be necessary to the investigation of the causes of the failure of the late expedition under Major General St. Clair.[7]

## Correspondence Involving United States Minister to France

In 1794, the Senate requested by resolution correspondence between the United States Minister to France and the Republic of France, and between the Minister and the State Department.[8] President Washington submitted certain of the correspondence requested, but withheld "those particulars which, in my judgment, for public considerations, ought not to be communicated."[9]

## The Jay Treaty

On March 24, 1796, the House of Representatives requested by resolution that the President disclose to the House his instructions to the United States Minister who negotiated the Jay Treaty with Great Britain, along with correspondence and documents relative to that Treaty. Implementation of the Treaty apparently required an appropriation which the House was called upon to vote.[10] President Washington denied the House's right to demand and receive any of the papers requested. Though the President had provided "all the papers affecting the negotiation with Great Britain" to the Senate in the course of its deliberations on the Treaty, Washington determined that the House had no legitimate claim to those papers:

> The nature of foreign negotiations requires caution; and their success must often depend on secrecy; and even, when brought to a conclusion, a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or con- templated would be extremely impolitic: for this might have pernicious influence on future negotiations; or produce immediate inconveniences, perhaps danger and mischief, in relation to other Powers. The necessity of such caution and secrecy was one cogent reason for vesting the power of making Treaties in the President with the advice and consent of the Senate; the principle on which the body was formed confining it to a small number of members. To admit, then, a right in the House of Representatives to demand, and to have, as a matter of course, all the papers respecting a negotiation with a foreign Power, would be to establish a dan- gerous precedent.

---

[7] 3 Annals of Cong. 536 (1792) (emphasis added).
[8] Senate Journal, 3d Cong , 1st Sess. 42 (1794).
[9] 1 J Richardson, Messages and Papers of the Presidents 152 (1896)
[10] *See* W. Binkley, *President and Congress* 53–4 (3d rev. 1947).

Subsequently, the House debated Washington's refusal for a full month, but took no action.[11] It is highly instructive, however, that during the debate Rep. James Madison, although disagreeing with President Washington's message in some respects, acknowledged on the House floor,

> that the Executive had a right, under a due responsibility, also, to withhold information, when of a nature that did not permit a disclosure of it at the time. And if the refusal of the President had been founded simply upon a representation, that the state of the business within his department, and the contents of the papers asked for, required it, although he might have regretted the refusal, he should have been little disposed to criticize it.[12]

## 2. Adams Administration

*Diplomatic Material Concerning United States Representatives to France*

In 1798 the House of Representatives by resolution requested from the President documents containing instructions to, and dispatches from, representatives of the United States to France.[13] On April 3, 1798, President Adams transmitted some of that material to both Houses, but omitted "some names and a few expessions descriptive of the persons" involved.[14]

## 3. Jefferson Administration

*The Burr Conspiracy*

In January 1807, the House of Representatives by resolution requested that the President

> lay before this House any information in possession of the Executive, *except such as he may deem the public welfare to require not to be disclosed,* touching any illegal combination of private individuals against the peace and safety of the Union, or any military expedition planned by such individuals against the territories of any Power in amity with the United States; together

---

[11] 5 Annals of Cong. 760 (1796); *see id.* at 426–783. The House did pass two resolutions, one declaring that the House had authority to consider the expediency of carrying a treaty into effect, the second that the House need not state the purpose for which it required information from the Executive. *See id.* at 771, 782–83.

[12] *Id.* at 773.

[13] House Journal, 5th Cong., 2d Sess. 249 (1798).

[14] 1 Richardson, *supra,* at 265.

> with the measures which the Executive has pursued and proposes
> to take for suppressing or defeating the same.[115]

President Jefferson replied by detailing the activities of Aaron Burr, but declined to mention the names of other alleged participants. Jefferson declared:

> The mass of what I have received in the course of these transactions is voluminous, but little has been given under the sanction of an oath so as to constitute formal and legal evidence. It is chiefly in the form of letters, often containing such a mixture of rumors, conjectures, and suspicions as renders it difficult to sift out the real facts and unadvisable to hazard more than general outlines, strengthened by concurrent information or the particular credibility of the relator. In this state of the evidence, delivered sometimes, too, under the restriction of private confidence, neither safety nor justice will permit the exposing names, except that of the principal actor, whose guilt is placed beyond question.[116]

### 4. Monroe Administration

*Stewart Incident*

In 1825, the House of Representatives requested by resolution that the President provide the Congress with documents concerning charges against certain naval officers, so far as he deemed such disclosure compatible with the public interest.[17] President Monroe refused to submit the documents, stating:

> In consequence of several charges which have been alleged against Commodore Stewart, touching his conduct while com-

---

[15] 16 Annals of Cong. 336 (1806) (emphasis added). Professor Raoul Berger has argued that the exception clause in the House resolution refutes any argument that Jefferson's subsequent withholding of documents was based on an executive privilege R. Berger, Executive Privilege: A Constitutional Myth 179–81 (1974) (describing Jefferson's explanation for withholding information as "gratuitous"). *See also* Cox, *Executive Privilege,* 122 U Pa L. Rev. 1383, 1397–98 (1974) (arguing that those historical examples of executive withholding which are preceded by a congressional authorization to withhold do not qualify as examples of executive privilege) One could just as well read the exception clause, however, as an early illustration of congressional recognition of the executive privilege. *See* § 1, C, *supra,* note 19 *infra.*

Moreover, it is highly unlikely Jefferson actually relied upon the exception clause as the basis for withholding information from the House, given the conclusions he reached while serving in President Washington's Cabinet, *see* § 1, A, *supra,* and given the views he expressed in a letter to the United States District Attorney for Virginia, who was then in charge of the Burr prosecution·

> Reserving the necessary right of the President of the U.S. to decide, *independently of all other authority, what papers, coming to him as President, the public interests permit to be communicated, & to whom,* I assure you of my readiness under that restriction, voluntarily to furnish .  . whatever the purposes of justice may require.

9 The Writings of Thomas Jefferson 55 (P. Ford ed 1898) Professor Berger also fails to note other occasions on which President Jefferson let it be known that he regarded himself free to withhold certain "confidential" information "given for my information in the discharge of my executive functions, and which my duties & the public interest forbid me to make public." *Id.* at 63–64 (certificate to the court in Burr prosecution).

[16] 1 Richardson, *supra,* at 412

[17] House Journal, 18th Cong , 2d Sess. 102–03 (1825).

manding the squadron of the United States [at] sea, it has been deemed proper to suspend him from duty and to subject him to trial on those charges. It appearing also that some of those charges have been communicated to the Department by Mr. Prevost, political agent at this time of the United States at Peru . . . and that charges have likewise been made against him by citizens of the United States engaged in commerce in that quarter, it has been thought equally just and proper that he should attend here, as well to furnish the evidence in his possession applicable to the charges exhibited against Commodore Stewart as to answer such as have been exhibited against himself.

In this stage the publication of those documents might tend to excite prejudices which might operate to the injury of both. It is important that the public servants in every station should perform their duty with fidelity, according to the injunctions of the law and the orders of the Executive in fulfillment thereof. It is peculiarly so that this should be done by the commanders of our squadrons, especially on distant seas, and by political agents who represent the United States with foreign powers. . . . It is due to their rights and to the character of the Government that they be not censured without just cause, which cannot be ascertained until, on a view of the charges, they are heard in their defense, and after a thorough and impartial investigation of their conduct. Under these circumstances it is thought that a communication at this time of those documents would not comport with the public interest nor with what is due to the parties concerned.[18]

## 5. Jackson Administration[19]

*Correspondence Between United States and the Republic of Buenos Aires*

On December 28, 1832, President Jackson refused to provide the House of Representatives with the copies of correspondence between the United States and the Republic of Buenos Aires and instructions given to the United States chargé d'affairs there, that it had requested. President Jackson replied that since negotia-

---

[18] 2 Richardson, *supra,* at 278.

[19] Former Columbia Law Professor and current Federal District Judge Abraham D. Sofaer has noted:
    Available historical sources reveal that, although much information was provided voluntarily, all Presidents from Washington to Jackson withheld large quantities of material, especially diplomatic correspondence, from their voluntary transmittals. Congress frequently requested the information thus withheld, and Presidents usually complied. Far more often than not, requests for information on sensitive issues contained qualifications authorizing the President to withhold material the disclosure of which might prejudice the nation. Qualifications of information requests dealing with such important issues as the Burr conspiracy exemplify a tradition of legislative deference and trust, surely worth considerable weight in the debate about the discretion inherently possessed by the President.

Sofaer, Book Review, 88 Harv. L Rev 281, 289 (1974) (reviewing R. Berger, *Executive Privilege: A Constitutional Myth)*

tions with the Republic had only been suspended and not broken off, it would "not be consistent with the public interest to communicate the correspondence and instructions requested by the House so long as the negotiation shall be pending."[20]

*Negotiations with Great Britain Over the Northeastern Boundary*

In response to the Senate's request for information regarding negotiations carried on with Great Britain over the Northeastern Boundary, and particularly with respect to the Maine settlement, President Jackson informed the Senate on March 2, 1833, that negotiations with Great Britain were in progress and that in the meantime it was "not deemed compatible with the public interest" to communicate the conditional arrangements made with the State of Maine.[21] The House of Representatives also requested information concerning the settlement of the Northeastern Boundary, and on January 6, 1835, President Jackson advised the House that it would be "incompatible with the public interest" to communicate such information.[22] However, the President did furnish this information to the Senate at the next session, stating that "as the negotiation was undertaken under the special advice of the Senate, I deem it improper to withhold the information which the body has requested, submitting to them to decide whether it will be expedient to publish the correspondence before the negotiation has been closed."[23]

*Bank of the United States Document*

On December 12, 1833, President Jackson responded to a resolution of the Senate requesting him to provide " 'a copy of the paper which has been published, and which purports to have been read by him to the heads of the Executive Departments . . . relating to the removal of the deposits of the public money from the Bank of the United States and its offices.' " President Jackson declined to provide the document on the ground that the Legislature had no constitutional authority to "require of me an account of any communication, either verbally or in writing, made to the heads of Departments acting as a Cabinet council . . . [nor] might I be required to detail to the Senate the free and private conversations I have held with those officers on any subject relating to their duties and my own."[24]

*Correspondence with France*

On February 6, 1835, President Jackson furnished extracts from the dispatches between the United States and the government of France that the House of

---

[20] 2 Richardson, *supra*, at 608–09
[21] *Id.* at 637.
[22] 3 Richardson, *supra*, at 127
[23] *Id.* at 229–30.
[24] *Id.* at 36.

757

Representatives had requested, declining to send the full documents on the ground that it was not at that time in the public interest to do so.[25]

*Removal of the Surveyor General*

On February 10, 1835, President Jackson sent a message to the Senate declining to comply with its resolution which requested the production of copies of charges made to the President against Gideon Fitz, the Surveyor General, which resulted in Mr. Fitz's removal from office. The resolution based the Senate's need for the documents on: 1) the need to nominate Mr. Fitz's successor, and 2) a pending Senate investigation into fraud in the sale of lands.

The President refused to furnish the documents on the ground that they related to subjects which belonged exclusively to the functions of the Executive. In addition, the President said that disclosure of the documents would subject the motives of the President in removing Mr. Fitz to the review of the Senate when not sitting as judges in an impeachment proceeding, and that the Executive's acquiescence in the Fitz case might be used by Congress as a precedent for similar and repeated requests. The President said:

> This is another of those calls for information made upon me by the Senate which have, in my judgment, either related to the subjects exclusively belonging to the executive department or otherwise encroached on the constitutional powers of the Executive. Without conceding the right of the Senate to make either of these requests, I have yet, for the various reasons heretofore assigned in my several replies, deemed it expedient to comply with several of them. It is now, however, my solemn conviction that I ought no longer, from any motive nor in any degree, to yield to these unconstitutional demands. Their continued repetition imposes on me, as the representative and trustee of the American people, the painful but imperious duty of resisting to the utmost any further encroachment on the rights of the Executive.
>
> . . . . Such a result, if acquiesced in, would ultimately subject the independent constitutional action of the Executive in a matter of great national concernment to the domination and control of the Senate. . . .
>
> I therefore decline a compliance with so much of the resolution of the Senate as requests "copies of the charges, if any," in relation to Mr. Fitz, and in doing so must be distinctly understood as neither affirming nor denying that any such charges were made. . . .[26]

---

[25] *Id.* at 129
[26] *Id.* at 132–34.

## 6. Tyler Administration

*Correspondence Regarding Negotiations with Great Britain Over the Northeastern Boundary*

In response to the House of Representatives' request for all correspondence not previously communicated regarding the United States' negotiation with Great Britain over the Northeastern Boundary, President Tyler withheld the documents and sent a February 26, 1842, message to Congress saying that "in my judgment no communication could be made by me at this time on the subject of its resolution without detriment or danger to the public interests."[27]

*Information Regarding Executive Appointments*

On March 23, 1842, President Tyler refused to comply with a House resolution requesting that the President and the heads of departments communicate the names of such Members of the 26th and 27th Congresses who had applied for office, what office, and whether such application had been made in person, in writing, or through friends. President Tyler refused to disclose such information on the ground that it was by nature confidential, the disclosure of which could serve no "useful object connected with a sound and constitutional administration of the Government in any of its branches," and further, that

> compliance with the resolution which has been transmitted to me would be a surrender of duties and powers which the Constitution has conferred exclusively on the Executive, and therefore such compliance can not be made by me nor by the heads of Departments by my direction. The appointing power, so far as it is bestowed on the President by the Constitution, is conferred without reserve or qualification. The reason for the appointment and the responsibility of the appointment rest with him alone. I can not perceive anywhere in the Constitution of the United States any right conferred on the House of Representatives to hear the reasons which an applicant may urge for an appointment to office under the executive department, or any duty resting upon the House of Representatives by which it may become responsible for any such appointment.[28]

*Treaty to Suppress Slave Trade*

In response to the House of Representatives' request to furnish, "'so far as may be compatible with the public interest,'" a copy of the quintuple treaty between the five powers of Europe for the suppression of the African slave trade

---

27 4 Richardson, *supra,* at 101.

28 *id.* at 105–06.

759

and certain correspondence with respect to it, President Tyler replied on June 20, 1842, that he had not received an authentic copy of the treaty and that "[i]n regard to the other papers requested, although it is my hope and expectation that it will be proper and convenient at an early day to lay them before Congress, . . . yet in my opinion a communication of them to the House of Representatives at this time would not be compatible with the public interest."[29]

## Information Regarding Steps Taken to Obtain Recognition of American Claims by Mexican Government

The Senate had requested the President to provide information, "so far as he might deem it compatible with the public interest," concerning what measures, if any, had been taken to obtain recognition by the Mexican government of certain claims of American citizens. President Tyler replied on August 23, 1842, that "[i]n the present state of the correspondence and of the relations between the two Governments on these important subjects it is not deemed consistent with the public interest to communicate the information requested. The business engages earnest attention, and will be made the subject of a full communication to Congress at the earliest practicable period."[30]

## Negotiations Regarding Northwestern Boundary

In response to the Senate's request for information concerning the United States' negotiations with Great Britain for settlement of the Northwest Boundary, President Tyler replied on December 23, 1842, that measures had been taken to settle the dispute and that "under these circumstances I do not deem it consistent with the public interest to make any communication on the subject."[31]

## Hitchcock Investigation

On January 31, 1843, President Tyler invoked executive privilege against a request by the House of Representatives to the Secretary of War to produce investigative reports submitted to the Secretary by Lieutenant Colonel Hitchcock concerning his investigations into frauds perpetrated against the Cherokee Indians. The Secretary of War consulted with the President and under the latter's direction informed the House that negotiations were then pending with the Indians for settlement of their claims, and that in the opinion of the President and the Department, publication of the report at that time would be inconsistent with the public interest. The Secretary of War further stated that the reports sought by the House contained information which was obtained by Colonel Hitchcock through *ex parte* questioning of persons whose statements were not made under oath, and which implicated persons who had no opportunity to contradict the

---

[29] *Id* at 158
[30] *Id.* at 178–79.
[31] *Id* at 210–11

760

allegations or provide any explanation. The Secretary of War expressed the opinion that to publicize such statements at that time would be unjust to the persons mentioned, and would defeat the object of the inquiry. He also stated that the Department had not yet been given a sufficient opportunity to pursue the investigation, to call the affected parties for explanations, or to make any other determinations regarding the matter. The President stated:

> The injunction of the Constitution that the President 'shall take care that the laws be faithfully executed,' necessarily confers an authority, commensurate with the obligation imposed to inquire into the manner in which all public agents perform the duties assigned to them by law. To be effective these inquiries must often be confidential. They may result in the collection of truth or of falsehood, or they may be incomplete and may require further prosecution. To maintain that the President can exercise no discretion as to the time in which the matters thus collected shall be promulgated . . . would deprive him at once of the means of performing one of the most salutary duties of his office. . . . To require from the Executive the transfer of this discretion to a coordinate branch of the Government is equivalent to the denial of its possession by him and would render him dependent upon that branch in the performance of a duty purely executive.[32]

In response to the House's claim that it had a right to demand from the Executive and heads of departments any information in the possession of the Executive which pertained to subjects under the House's deliberations, President Tyler stated that the House could not exercise a right to call upon the Executive for information, even though it related to a subject of the deliberations of the House, if, by so doing, it would interfere with the discretion of the Executive.[33]

*Instructions to Navy Officers*

In response to the House of Representatives' request for copies of instructions given to British and American commanding officers who were charged, pursuant to a treaty with Great Britain, with suppressing the slave trade off the coast of Africa, President Tyler sent a May 18, 1844, message to the House declining to provide the information on the ground that to do so would be incompatible with the public interest.[34]

*Foreign Correspondence Regarding the Ownership and Occupation of Oregon Territory*

In June 1844, President Tyler sent a message to the Senate explaining his refusal to comply with its request for documents relating to the ownership and

---

[32] *Id.* at 222.
[33] *Id* at 222–23.
[34] *Id.* at 320.

occupation of the Oregon Territory. "[I]n the present state of the subject-matter," the President wrote, "it is deemed inexpedient to communicate the information requested. . . ."[35]

## 7. Polk Administration

*Foreign Relations Expenditures of Prior Administration*

In 1846, President Polk refused to provide the House of Representatives with confidential memoranda regarding certain expenses incurred for the conduct of foreign relations during the Tyler Administration. In refusing to comply with a House resolution requesting documentation of these expenses, President Polk stated that where a past President had placed a seal of confidentiality upon an expenditure, and the matter was terminated before he entered office,

> [a]n important question arises, whether a subsequent President, either voluntarily or at the request of one branch of Congress, can without a violation of the spirit of the law revise the acts of his predecessor and expose to public view that which he had determined should not be "made public." If not a matter of strict duty, it would certainly be a safe general rule that this should not be done. Indeed, it may well happen, and probably would happen, that the President for the time being would not be in possession of the information upon which his predecessor acted, and could not, therefore, have the means of judging whether he had exercised his discretion wisely or not.[36]

Polk concluded that the President making an expenditure, deemed by him confidential, may, if he chooses, keep all the information and evidence upon which he acts in his own possession. If, for the information of his successors, he leaves some evidence upon which he acts in the confidential files of one of the executive departments, such evidence does not thereby become publicly available.

*Military and Diplomatic Instructions with Respect to Mexico*

On January 12, 1848, President Polk sent a message to the House transmitting reports of the Secretaries of State, War, and the Navy in response to a congressional resolution seeking copies of all instructions given to American military and diplomatic officers relating to the return of President General Lopez de Santa Anna to Mexico. President Polk stated that he was transmitting the documents,

---

[35] *Id.* at 327.
[36] *Id.* at 433.

which contain all the information in the possession of the Executive which it is deemed compatible with the public interests to communicate. . . .

The customary and usual reservation contained in calls of either House of Congress upon the Executive for information relating to our intercourse with foreign nations has been omitted in the resolution before me. The call of the House is unconditional. It is that the information requested be communicated, and thereby be made public, whether in the opinion of the Executive (who is charged by the Constitution with the duty of conducting negotiations with foreign powers) such information, when disclosed, would be prejudicial to the public interest or not. It has been a subject of serious deliberation with me whether I could, consistently with my constitutional duty and my sense of the public interests involved and to be affected by it, violate an important principle, always heretofore held sacred by my predecessors, as I should do by a compliance with the request of the House. President Washington, in a message to the House of Representatives of the 30th of March, 1796, declined to comply with a request contained in a resolution of that body, to lay before them "a copy of the instructions to the minister of the United States who negotiated the treaty with the King of Great Britain, together with the correspondence and other documents relative to that treaty, excepting such of the said papers as any existing negotiation may render improper to be disclosed."

. . . Indeed, the objections to complying with the request of the House contained in the resolution before me are much stronger than those which existed in the case of the resolution in 1796. This resolution calls for the "instructions and orders" to the minister of the United States to Mexico which relate to negotiations which have not been terminated, and which may be resumed. The information called for respects negotiations which the United States offered to open with Mexico immediately preceding the commencement of the existing war. The instructions given to the minister of the United States relate to the differences between the two countries out of which the war grew and the terms of adjustment which we were prepared to offer to Mexico in our anxiety to prevent the war. These differences still remain unsettled, and to comply with the call of the House would be to make public through that channel, and to communicate to Mexico, now a public enemy engaged in war, information which could not fail to produce serious embarrassment in any future negotiation between the two countries. I have heretofore communicated to Congress all the correspondence of the minister of the United States to Mexico which in the existing state of our relations with

that Republic can, in my judgment, be at this time communicated without serious injury to the public interest.

Entertaining this conviction, and with a sincere desire to furnish any information which may be in possession of the executive department, and which either House of Congress may at any time request, I regard it to be my constitutional right and my solemn duty under the circumstances of this case to decline a compliance with the request of the House contained in their resolution.[37]

### Diplomatic Instructions Relating to United States–Mexico Treaty

On July 29, 1848, President Polk refused to comply with a request by the House of Representatives for copies of instructions provided to commissioners who negotiated the treaty with Mexico on the ground that "it would be 'inconsistent with the public interests' to give publicity to these instructions at the present time." He added that, "as a general rule applicable to all our important negotiations with foreign powers, it could not fail to be prejudicial to the public interest to publish the instructions of our ministers until some time had elapsed after the conclusion of such negotiations."[38]

President Polk did transmit these documents to the House on February 8, 1849, at which time he reaffirmed the general rule enunciated on July 29, but stated that, notwithstanding that, "as [the documents] have been again called for by the House, and called for in connection with other documents, to the correct understanding of which they are indispensable, I have deemed it my duty to transmit them."[39]

## 8. Fillmore Administration

### Diplomatic Instructions

Upon receipt of a request from the Senate to furnish, if not inconsistent with the public interest, information concerning the seizure of the American steamship *Prometheus* by a British war vessel and the measures taken to vindicate "the honor of the country," President Fillmore, on December 15, 1851, transmitted excerpts from a communication giving the facts of the case, but without the instructions given to the United States Minister in London. He declared that "[s]ufficient time has not elapsed for the return of any answer to this dispatch from him, and in my judgment it would at the present moment be inconsistent with the public interest to communicate those instructions. A communication, however, of all the correspondence will be made to the Senate at the earliest moment at which a proper regard to the public interest will permit."[40]

---

[37] *Id* at 565, 566, 567.
[38] *Id.* at 602.
[39] *Id.* at 679.
[40] 5 Richardson, *supra*, at 139–40.

In response to a Senate request for papers and proofs on file with the Executive Branch regarding the claim of Samuel A. Belden & Co. against the Mexican government, on May 29, 1852, President Fillmore forwarded all documents save those of a diplomatic nature, and stated that because the claim was still being negotiated it was therefore "not deemed expedient . . . to make public the documents which have been reserved."[41]

### *Sandwich Islands*

On August 14, 1852, President Fillmore refused to provide information to the Senate regarding a proposition made by the King of the Sandwich Islands to transfer the islands to the United States, as not comporting with the public interest.[42]

## 9. Buchanan Administration

### *Law Enforcement Files*

On January 11, 1859, President Buchanan responded to a request by the Senate for information relating to the landing of a slave ship on the coast of Georgia. The President transmitted a report from the Attorney General which stated that an offense had been committed and that measures were being taken to enforce the law. However, he concurred with the opinion of the Attorney General that "it would be incompatible with the public interest at this time to communicate the correspondence with the officers of the Government at Savannah or the instructions which they have received."[43]

## 10. Lincoln Administration

### *Fort McHenry Arrests*

On July 27, 1861, President Lincoln refused to provide to the House of Representatives documents revealing the grounds, reasons, and evidence upon which Baltimore police commissioners were arrested at Fort McHenry for the reason that disclosure at that time would be incompatible with the public interest.[44]

### *Arrest of Brigadier General Stone*

On May 1, 1862, President Lincoln refused to comply with a request by the Senate for more particular information regarding the evidence leading to the

---

[41] *Id.* at 151.
[42] *Id* at 159.
[43] *Id.* at 534.
[44] 6 Richardson, *supra.* at 33.

arrest of Brigadier General Stone on the ground that the determination to arrest and imprison him was made upon the evidence and in the interest of public safety, and that disclosure of more particular information was incompatible with the public interest.[45]

## Negotiations with New Granada

The House of Representatives had requested the Secretary of State to communicate to it, "if not in his judgment incompatible with the public interest," information concerning American relations with New Granada, and what negotiations, if any, had been had with General Herran of that country. President Lincoln, on January 14, 1863, replied to the resolution giving a résumé of developments in New Granada. However, with respect to official communications with General Herran, he stated that "[n]o definitive measure or proceeding has resulted from these communications, and a communication of them at present would not, in my judgment, be compatible with the public interest."[46]

## 11. Johnson Administration

### Military Correspondence

On January 26, 1866, President Johnson refused to disclose to the Senate certain communications from military officers regarding violations of neutrality on the Rio Grande on the ground that such disclosure would not be consistent with the public interest.[47]

### Confinement of Jefferson Davis

On February 9, 1866, President Johnson refused, on advice from the Secretary of War and the Attorney General, to comply with a request by the House of Representatives for a report by the Judge Advocate General concerning the confinement of Jefferson Davis, and others, on the ground that disclosure would not be in the public interest.[48]

### New Orleans Investigations

On May 2, 1866, President Johnson refused to provide the House of Representatives with a copy of a report that it had requested concerning General Smith's and James T. Brady's New Orleans investigations, citing the public interest in nondisclosure.[49]

---

[45] *Id.* at 74.
[46] *Id.* at 147, 149.
[47] *Id.* at 376–77.
[48] *Id.* at 378.
[49] *Id.* at 385.

766

## 12. Grant Administration

*Performance of Executive Functions*

In April 1876, President Grant was requested by the House of Representatives to provide information which would show whether any executive acts or duties had been performed away from Washington, the lawfully established seat of government. (This was an attempt to embarrass the President for having spent the hot summer at Long Beach.) On May 4, 1876, the President refused on the ground that the Constitution did not give the House of Representatives authority to inquire of the President where he performed his executive functions, and that, moreover, the House's lawful demands on the Executive were limited to information necessary for the proper discharge of its powers of legislation or impeachment.[50]

## 13. Cleveland Administration

*Dismissal of District Attorney*

In response to a resolution by the Senate requesting the Attorney General to provide certain documents concerning the administration of the United States Attorney's Office (then District Attorney) for the Middle District of Alabama, and the President's dismissal of the incumbent district attorney, President Cleveland sent a message on March 1, 1886, to the Senate stating that he was withholding the requested documents because they contained information addressed to him and to the Attorney General by private citizens concerning the former district attorney, and that the documents related to an act (the suspension and removal of an Executive Branch official) which was exclusively a discretionary executive function.[51]

*"Rebecca" Schooner Incident*

On February 26, 1887, President Cleveland refused to provide the Senate with information that it requested regarding the seizure and sale of the American schooner *Rebecca* at Tampico, and the resignation of the Minister of the United States to Mexico, on the ground that publication of the requested correspondence would be inconsistent with the public interest.[52]

## 14. Harrison Administration

*International Conference on the Use of Silver*

In response to the Senate's request for information regarding the steps taken toward holding an international conference on the use of silver, President Har-

---

[50] 7 Richardson, *supra,* at 361–66
[51] 8 Richardson, *supra.* at 375.
[52] *Id.* at 538

767

rison stated on April 26, 1892, that "in my opinion it would not be compatible with the public interest to lay before the Senate at this time the information requested, but that at the earliest moment after definite information can properly be given all the facts and any correspondence that may take place will be submitted to Congress."[53]

## 15. Cleveland Administration

*Cuba Matters*

In response to a request by the House of Representatives for copies of all correspondence relating to affairs in Cuba since February 1895, President Cleveland transmitted on February 11, 1896, a communication from the Secretary of State and such portions of the correspondence requested as he deemed it not inconsistent with the public interest to communicate.[54]

*Correspondence with Spain*

On May 23, 1896, President Cleveland transmitted to the Senate a requested copy of the protocol with Spain, but withheld copies of certain correspondence with Spain on the ground that it would be incompatible with the public good to furnish such correspondence.[55]

## 16. McKinley Administration

*War Department Investigations*

In response to a request made by the Senate to the Secretary of War for a report on the War Department's investigation into receipts and expenditures of Cuban funds, President McKinley informed the Senate on January 3, 1901, that it was not deemed compatible with the public interest to transmit the document at that time.[56]

## 17. Theodore Roosevelt Administration

*United States Steel Proceedings*

On January 4, 1909, the Senate passed a resolution directing the Attorney General to inform the Senate whether certain legal proceedings had been instituted against the United States Steel Corporation, and if not, the reasons for its non-action. A request was also made for the opinions of the Attorney General regarding this matter, if any had been written. President Roosevelt replied to the Senate on January 6, 1909, stating that he had been orally advised by the Attorney

---

[53] 9 Richardson, *supra*, at 238–39.

[54] *Id.* at 666.

[55] *Id.* at 669.

[56] 9 Richardson, *supra*, at 6458 (Bur of Nat'l Literature ed. 1911).

General that there were insufficient grounds for instituting legal action against U.S. Steel, and that he had

> instructed the Attorney General not to respond to that portion of the resolution which calls for a statement of his reasons for nonaction. I have done so because I do not conceive it to be within the authority of the Senate to give directions of this character to the head of an executive department, or to demand from him reasons for his action. Heads of the executive departments are subject to the Constitution, and to the laws passed by the Congress in pursuance of the Constitution, and to the directions of the President of the United States, but to no other direction whatever.[57]

When the Senate was unable to get the documents from the Attorney General, it subpoenaed the Commissioner of Corporations to produce all papers and documents regarding U.S. Steel in his possession. The Commissioner reported the request to the President, who sought an opinion from Attorney General Bonaparte regarding the Commission's statutory obligation to withhold such information except upon instruction by the President. The Attorney General advised the Commissioner that the discretion to make public the requested documents was vested in the President and that, accordingly, he should turn over all documents within the scope of the subpoena to the President.[58] The Commissioner did so, and President Roosevelt then informed the Judiciary Committee that he had the papers and that the only way the Senate could get them was through his impeachment. President Roosevelt also explained that some of the facts were given to the government under a pledge of secrecy and that the government had an obligation to keep its word.[59]

## 18. Coolidge Administration

*Bureau of Internal Revenue Oversight*

On April 11, 1924, President Coolidge responded to a request by the Senate for a list of all companies in which the Secretary of the Treasury "was interested" (for the purpose of investigating their tax returns) as a part of a general oversight investigation of the Bureau of Internal Revenue. President Coolidge refused to provide the information on the ground that it was confidential information the disclosure of which would be detrimental to public service, calling the Senate's investigation an "unwarranted intrusion," born of a desire other than to secure information for legitimate legislative purposes.[60]

---

[57] 43 Cong. Rec. 528 (1909).
[58] 27 Op Att'y Gen. 150 (1909).
[59] E Corwin, The President—Office and Powers 429 (1957).
[60] 65 Cong. Rec 6087 (1924)

## 19. Hoover Administration

*London Treaty Letters*

On July 11, 1930, President Hoover responded to a request addressed to the Secretary of State from the Senate Foreign Relations Committee for certain confidential telegrams and letters leading up to the London Naval Conference and the London Treaty. The Committee members had been permitted to see the documents with the understanding that the information contained therein would be kept confidential. The Committee asserted its right to have full and free access to all records touching on the negotiation of the Treaty, basing its right on the constitutional prerogative of the Senate in the treaty-making process. In his message to the Senate, President Hoover pointed out that there were a great many informal statements and reports which were given to the government in confidence. The Executive was under a duty, in order to maintain amicable relations with other nations, not to publicize every negotiating position and statement which preceded final agreement on the Treaty. He stated that the Executive must not be guilty of a breach of trust, nor violate the invariable practice of nations. "In view of this, I believe that to further comply with the above resolution would be incompatible with the public interest."[61]

## 20. Franklin D. Roosevelt Administration

*FBI Records*

On April 30, 1941, at the direction of President Roosevelt, Attorney General Jackson wrote the Chairman of the House Committee on Naval Affairs, stating his refusal to provide the Committee with certain FBI records. Attorney General Jackson declared that "all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest."[62]

*Radio Intelligence Material*

Pursuant to a January 19, 1943, resolution, a House Select Committee to Investigate the Federal Communications Commission (FCC) subpoenaed the Director of the Bureau of the Budget on July 9, 1943, to appear before the Select Committee and produce Bureau files and correspondence dealing with requests by the War and Navy Departments to the President for an executive order transferring the functions of the FCC's Radio Intelligence Division to the military establishments. The Director refused, citing Attorney General Jackson's letter of

---

[61] S. Doc No. 216, 71st Cong , Special Sess 2 (1930).

[62] 40 Op. Att'y Gen 45, 46 (1941)

April 30, 1941, and a presidential instruction that the Bureau's files were to be kept confidential, because disclosure would not comport with the public interest.[63]

In addition, the Acting Secretary of War was requested to appear before the Select Committee to produce documents bearing on the War and Navy Departments' requests to the President and to bring several Army officers to testify. The Acting Secretary refused to provide the documents on the President's direction, on the ground that doing so would be incompatible with the public interest, and, pursuant to his own judgment, refused to permit the Army officers to appear.[64]

## FBI Records

In 1944, the same Select Committee subpoenaed the Director of the Federal Bureau of Investigation to testify concerning fingerprint records and activities at Pearl Harbor, and also to identify a certain document which he was alleged to have received in the course of his duties. The Director refused to give testimony or to exhibit a copy of the President's directive requiring him, in the interest of national security, to refrain from testifying or disclosing the contents of the Bureau's files.[65] Attorney General Biddle wrote a letter to the Select Committee, dated January 22, 1944, informing the Committee that communications between the President and the heads of departments were privileged and not subject to inquiry by congressional committees.[66]

## 21. Truman Administration

### Condon Incident

In March 1948, the House Committee on Un-American Activities issued a subpoena to the Secretary of Commerce directing him to appear before the Committee and to bring with him a letter from the Director of the FBI concerning the loyalty of Dr. Condon, Director of the National Bureau of Standards, together with all records, files, and transcripts of the loyalty board relating to Dr. Condon. On March 13, 1948, President Truman issued a directive providing for the confidentiality of all loyalty files and requiring that all requests for such files from sources outside the Executive Branch be referred to the Office of the President, for such response as the President may determine. 13 Fed. Reg. 1359 (1948). At a press conference held on April 22, 1948, President Truman indicated that he would not comply with the request to turn the papers over to the Committee.[67]

### Steelman Incident

On March 6, 1948, during an investigation into a strike among employees of Government Services, Inc., a subcommittee of the House Committee on Educa-

---

[63] *Study and Investigation of the Federal Communications Commission Hearings on H Res. 21 Before the House Select Comm. to Investigate the Federal Communications Commission*, 78th Cong., 1st Sess 37 (1943).

[64] *Id* at 67–68

[65] *Id*. at 2304–05.

[66] *Id* at 2337–39

[67] The Public Papers of the Presidents, Harry S Truman, 1948, at 228

tion and Labor issued a subpoena to presidential assistant John R. Steelman.[68] Mr. Steelman returned the subpoena to the chairman of the subcommittee on the ground that "the President directed me, in view of my duties as his assistant, not to appear before your subcommittee."[69] The minority report to H.R. Rep. No. 1595 commented on Mr. Steelman's failure to comply with the subpoena as follows:

> the purpose of the subpoena on Mr. Steelman was to obtain from him the contents of any oral or written communications which had been made to him by the President with reference to the strike prevailing in the restaurants maintained by Government Services, Inc. I cannot believe that any congressional committee is entitled to make that kind of investigation into the private conferences of the President with one of his principal aides. I cannot conceive that the views of a Senator or Congressman on a pending bill may be extracted by a court or by a congressional committee by subpoenaing the Senator's of [sic] Congressman's administrative assistant or any other assistant, secretary, or confidential employee. Likewise, I regard it as a direct invasion of the Executive's prerogative to invade the work and time of his assistant in this manner. Dr. Steelman I think acted with the utmost propriety in referring the matter to the President. The Chief Executive very naturally and properly directed Dr. Steelman not to appear before the subcommittee.[70]

### State Department Employee Loyalty Investigation

On March 28, 1950, a subcommittee of the Senate Foreign Relations Committee investigating allegations of disloyalty among State Department employees served subpoenas on the Secretary of State, the Attorney General, and the Chairman of the Civil Service Commission, demanding the production of all files bearing on the loyalty of certain State Department employees. After reference of the subpoena to the President pursuant to the directive of March 13, 1948, the President on April 3, 1950, directed the officials not to comply with the subpoena.[71] Thereafter it appeared that the subpoenaed documents had been made available to the preceding Congress prior to the issuance of the March 13, 1948, directive. President Truman thereupon agreed to make the files available to the subcommittee on the theory that this would not constitute a precedent for subsequent exceptions from the March 13, 1948, directive.[72]

---

[68] *Investigation of GSI Strike: Hearings on H. Res 111 Before a Special Subcomm. of the House Comm. on Education and Labor,* 80th Cong , 2d Sess. 347–53 (1948).

[69] H R Rep. No. 1595, 80th Cong., 2d Sess. 3 (1948); *see id* Pt. 2, at 8.

[70] *Id.* Pt. 1, at 12

[71] The Public Papers of the Presidents, Harry S Truman, 1950, at 240.

[72] S. Rep. No. 2108, 81st Cong., 2d Sess. 9 (1950)

## General Bradley Incident

During the investigation into the circumstances surrounding the dismissal of General Douglas MacArthur held by the Senate Committees on Armed Services and Foreign Relations in 1951, General Bradley refused to testify about a conversation with President Truman in which he had acted as the President's confidential adviser. The Chairman of the Committee, Senator Russell, recognized Bradley's claim of privilege. When that ruling was challenged, the Committee upheld it by a vote of 18 to 8.[73] At a press conference held on May 17, 1951, President Truman indicated that he had previously taken the position that his conversation with General Bradley was privileged and that he was "happy" with the Committee's action.[74]

## Refusal to Comply with an Excessively Burdensome Demand for Information

During an investigation into the administration of the Department of Justice by a special subcommittee of the House Judiciary Committee, the chairman of the subcommittee requested a number of departments and agencies to furnish the following information:

> A list of all cases referred to the Department of Justice or U.S. Attorneys for either criminal or civil action by any governmental department or agency within the last six years, in which:
> a. Action was declined by the Department of Justice, including in each such case the reason or reasons assigned by said Department for such refusal to act.
> b. Said cases were returned by the Department of Justice to the governmental Department or agency concerned for further information or investigation. In such cases, a statement of all subsequent action taken by the Department of Justice should be included.
> c. Said cases have been referred to the Department of Justice and have been pending in the Department for a period of more than one year and are not included in b. above.[75]

President Truman instructed the heads of all agencies and departments not to comply with that request for the following reasons set forth in his letter, dated March 7, 1952, to the chairman of the subcommittee:

> [T]his request of yours is so broad and sweeping in scope that it would seriously interfere with the conduct of the Government's business if the departments and agencies should undertake to

---

[73] *Military Situation in the Far East· Hearings Before the Senate Comm. on Armed Services and the Senate Comm. on Foreign Relations*, 82d Cong., 1st Sess. 763, 832–72 (1951).

[74] The Public Papers of the Presidents, Harry S Truman, 1951, at 289.

[75] The Public Papers of the Presidents, Harry S Truman, 1952–53, at 199.

comply with it. I am advised that it would require the examination of hundreds of thousands of files, that it would take hundreds of employees away from their regular duties for an extensive period of time, and that it would cost the Government millions of dollars. All this would be done, not for the purpose of investigating specific complaints, not for the purpose of evaluating credible evidence of wrongdoing, but on the basis of a dragnet approach to examining the administration of the laws.

I do not believe such a procedure to be compatible with those provisions of the Constitution which vest the executive power in the President and impose upon him the duty to see that the laws are faithfully executed.[76]

## Confidentiality of Administration of Loyalty Security Program

In the spring of 1952 members of a Senate Appropriations subcommittee sought detailed information on the administration of the Loyalty Security Program. In response to a request for guidance by the Department of State, President Truman on April 3, 1952, issued detailed instructions which provided for the confidentiality of the Loyalty Security Program. These instructions provided, *inter alia:*

There is no objection to making available the names of all members of an agency loyalty board, but it is entirely improper to divulge how individual board members voted in particular cases or to divulge the members who sat on particular cases. If this type of information were divulged freely, the danger of intimidation would be great, and the objectivity, fairness and impartiality of board members would be seriously prejudiced.[77]

## 22. Eisenhower Administration

### Executive Branch Deliberative Discussions

During the Army-McCarthy Hearings, the counselor of the Army was questioned about discussions which had taken place during a conference of high-level government officials.

On May 17, 1954, President Eisenhower directed the Secretary of Defense to instruct the employees of his Department not to testify on those issues. The President's letter stated:

Because it is essential to efficient and effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters,

---

[76] *Id.*
[77] *Id.* at 235–36.

774

and because it is not in the public interest that any of their conversations or communications, or any documents or reproductions, concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications, or to produce any such documents or reproductions. This principle must be maintained regardless of who would be benefited by such disclosures.[78]

This letter was interpreted as requiring every officer and employee of the government to claim privilege on his own in any situation covered by that letter. Hence there were a considerable number of invocations of executive privilege during the Eisenhower Administration which were not referred to, or specifically authorized by, the President.

### Conversation with Presidential Assistant Sherman Adams

During hearings in July 1955 on the Dixon-Yates Contract before the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee, Securities and Exchange Commission Chairman Armstrong was questioned on various issues. During most of his testimony, questions of privilege were disposed of without reference to the White House. When questioned about a telephone conversation with Presidential Assistant Sherman Adams, he sought the advice of the Special Counsel to the President who, upon advice of the Attorney General, directed that Mr. Armstrong could testify as to existence of the conversation, but not as to matters discussed during the conversation.[79]

### Killian and Gaither Panel Reports

In connection with an investigation into satellite and missile programs in January 1958, then-Senator Lyndon Johnson asked for the release of the so-called Killian and Gaither Panel reports. President Eisenhower denied the request in part on the ground that the reports had been prepared with the understanding that the advice contained in them would be kept confidential. The President added that "these reports are documents of the National Security Council. Never have the documents of this Council been furnished to the Congress."[80]

### Confidentiality of ICA Country Reports

Between 1957 and 1959 the International Cooperation Administration (ICA), the predecessor to the Agency for International Development (AID), repeatedly

---

[78] The Public Papers of the Presidents, Dwight D Eisenhower, 1954, at 483–84

[79] *Power Policy. Dixon-Yates Contract Hearings on S Res 61 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm on the Judiciary*. 84th Cong., 1st Sess. 751 (1955).

[80] The Public Papers of the Presidents, Dwight D. Eisenhower, 1958, at 117–18.

denied to Congress and to the Comptroller General access to its country evaluation reports on the ground that they contained confidential opinions and tentative recommendations on matters involving foreign policy. These refusals were made without express presidential authorization.

When this issue came up at President Eisenhower's news conference of July 1, 1959, the President approved these withholdings largely on the ground that the release of the reports would jeopardize the ability of the United States to obtain confidential information.[81]

The Mutual Security legislation of 1959–1961 provided in effect that the ICA could withhold information from Congress or the Comptroller General only upon a presidential certification that he had forbidden the document be furnished and stated the reason for so doing. President Eisenhower made the following certifications:

> November 12, 1959, relating to an evaluation report on Vietnam;[82]
>
> December 22, 1959, relating to evaluation reports on Iran and Thailand;[83]
>
> December 2, 1960, relating to evaluation reports on several South American countries. These reports apparently were made available to the Comptroller General during the following Administration.[84]

### 23. Kennedy Administration

*Confidentiality of Names of Specific Government Employees*

During an investigation into military cold war education and speech review policies conducted by the Senate Committee on Armed Services, Senator Thurmond requested the names of individual government employees of the Department of Defense and the Department of State who made or recommended changes in specific speeches.

On February 8, 1962, President Kennedy directed the Secretary of Defense and all personnel under the jurisdiction of his Department not to give any testimony or produce any documents which would disclose such information. The letter stated:

> [I]t would not be possible for you to maintain an orderly Department and receive the candid advice and loyal respect of your subordinates if they, instead of you and your senior associates, are to be individually answerable to the Congress, as well as to you, for their internal acts and advice.
>
> *     *     *     *     *
>
> I do not intend to permit subordinate officials of our career

---

[81] *Id.*, 1959, at 488, 489.
[82] *Id.* at 776.
[83] *Id.* at 874
[84] *Id*, 1960–61, at 881

services to bear the brunt of congressional inquiry into policies which are the responsibilities of their superiors.[85]

Chairman Stennis upheld the claim of privilege. The ruling was upheld by the Subcommittee.[86] On February 9, 1962, President Kennedy sent a similar letter to the Secretary of State.[87]

### Confidentiality of National Security Council Papers

Later, during the same investigation into military cold war education and speech review policies, Senator Thurmond demanded certain National Security Council papers. In a letter to Chairman Stennis dated June 23, 1962, President Kennedy refused to release those papers on the ground that "the unbroken precedent of the National Security Council is that its working papers and policy documents cannot be furnished to the Congress."[88]

### 24. Johnson Administration

### Exemption of Presidential Assistants from Appearance Before Congressional Committees

In 1968, during hearings on the nomination of Justice Fortas to be Chief Justice of the United States, Treasury Under Secretary Barr, Associate Special Counsel to the President DeVier Pierson, and Secretary of Defense Clark Clifford were invited to appear before the Senate Committee on the Judiciary to testify on the question whether Justice Fortas had participated in high-level White House meetings dealing with the development of legislation authorizing the Secret Service to protect presidential candidates.

By letters dated September 16, 1968, Mr. Barr and Mr. DeVier Pierson both declined the invitation. Mr. Barr's letter contained the following pertinent language:

> In the development of this legislation, I participated in meetings with representatives of the White House and discussed the matter directly with the President.
> Based on long-standing precedents, it would be improper for me under these circumstances to give testimony before a Congressional committee concerning such meetings and discussions. Therefore, I must, with great respect, decline your invitation to appear and testify.

Mr. DeVier Pierson stated:

---

[85] *Military Cold War Education and Speech Review Policies: Hearings Before the Special Preparedness Subcomm. of the Senate Comm. on Armed Services,* 87th Cong., 2d Sess. 508–509 (1962).

[86] *Id.* at 513–14.

[87] *Id.* at 725.

[88] *Id.* at 2951–57, 3160–61.

As Associate Special Counsel to the President since March of 1967, I have been one of the "immediate staff assistants" provided to the President by law. (3 U.S.C. 105, 106.) It has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President. This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings.

The Secretary of Defense also asked to be excused from a personal appearance before the Committee, stating that "because of the complexities of the current world situation, my time is fully occupied in meeting my obligations and responsibilities as Secretary of Defense."[89]

## 25. Nixon Administration

*FBI Investigative Files*

On November 21, 1970, the Attorney General, with the specific approval of the President, refused to release certain investigative files of the Federal Bureau of Investigation to Rep. L. H. Fountain, Chairman of the Intergovernmental Relations Subcommittee of the House Government Operations Committee. The reports discussed certain scientists nominated by the President to serve on advisory boards of the Department of Health, Education and Welfare.[90]

*Military Assistance Plan*

On August 30, 1971, President Nixon declined to make available to the Senate Foreign Relations Committee the Five-Year Plan for the Military Assistance Program.[91] In a memorandum to the Secretaries of State and Defense, the President stated:

The Senate Foreign Relations Committee has requested "direct access to the Executive Branch's basic planning data on Military Assistance" for future years and the several internal staff papers containing such data. The basic planning data and the various

---

[89] *Nominations of Abe Fortas and Homer Thornberry: Hearings Before the Senate Comm. on the Judiciary,* 90th Cong., 2d Sess. 1347, 1348, 1363 (1968).

[90] Memorandum for Honorable William S. Moorhead, Chairman, Subcommittee on Foreign Operations and Government Information of the House Committee on Government Operations, from Deputy Assistant Attorney General Mary Lawton (Apr. 25, 1973) (Lawton Memorandum); U.S. Government Information Policies and Practices—The Pentagon Papers, Part 2, House Comm. on Government Operations, 92d Cong., 1st Sess 362–63 (1971).

[91] *Executive Privilege. The Withholding of Information By the Executive: Hearing Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary,* 92d Cong., 1st Sess. 45–46 (1971).

internal staff papers requested by the Senate Foreign Relations Committee do not, insofar as they deal with future years, reflect any approved program of this Administration. . . .

I am concerned, as have been my predecessors, that unless privacy of preliminary exchange of views between personnel of the Executive Branch can be maintained, the full frank and healthy expression of opinion which is essential for the successful administration of Government would be muted.

I have determined, therefore, that it would not be in the public interest to provide to the Congress the basic planning data on military assistance as requested by the Chairman. . . .[92]

### AID Information Concerning Foreign Assistance to Cambodia

On March 15, 1972, the President directed the Secretary of State to withhold from the Foreign Operations and Government Information Subcommittee of the House Government Operations Committee the Agency for International Development (AID) country field submissions for Cambodian foreign assistance for fiscal year 1973.[93]

### USIA Memoranda

On the same date the President instructed the Director of the United States Information Agency (USIA) to decline to provide to the Senate Foreign Relations Committee all USIA country program memoranda.[94]

### Watergate

President Nixon, asserting executive privilege during 1973 and 1974, refused to provide to the Senate Select Committee on Presidential Campaign Activities (Watergate Committee) and to the House Judiciary Committee various tape recordings of conversations involving the President, and other materials relating to the involvement of 25 named individuals in criminal activities connected with the 1972 presidential election.[95]

## 26. Carter Administration

### Department of Energy Gas Conservation Fee Documents

In April 1980 the Subcommittee on Environment, Energy and Natural Resources of the House Committee on Government Operations subpoenaed docu-

---

[92] Id at 46.

[93] 118 Cong. Rec 8694 (1972); Lawton Memorandum, supra.

[94] Id.

[95] See J. Hamilton, The Power to Probe 23–26, 65 (1976); Cox, Executive Privilege, 122 U. Pa. L Rev 1383, 1420 (1974) Although the tape recordings were eventually turned over to the House Judiciary Committee, the President's refusal to make those same tapes available to the Senate Watergate Committee was unanimously affirmed by the U.S. Court of Appeals for the District of Columbia Circuit Senate Select Committee v. Nixon, 498 F.2d 725 (1974) (en banc) President Nixon's refusal to disclose Watergate-related tapes and documents in response to a subpoena in a criminal case is beyond the scope of this memorandum See generally United States v Nixon, 418 U.S. 683 (1974)

ments reflecting intra-Executive Branch deliberations concerning the President's decision to impose a conservation fee on imports of crude oil and gasoline.[96] For several weeks representatives of the Executive Branch negotiated with the Subcommittee about releasing the documents. On April 25, 1980, Secretary of Energy Duncan informed the Subcommittee that "the President has instructed me to pursue all reasonable grounds of accommodation. If there are no further reasonable avenues of negotiation, the President has instructed me to assert a privilege with respect to these documents."[97] Ultimately, some but not all of the documents were given to the Subcommittee, which tacitly withdrew its request for documents that reflected deliberations directly involving the Executive Office of the President.[98]

## 27. Reagan Administration

*Secretary Watt's Implementation of the Mineral Lands Leasing Act*

On October 2, 1981, the Oversight and Investigations Subcommittee of the House Committee on Energy and Commerce served a subpoena on Secretary of the Interior James Watt for all documents relative to his determination of Canadian reciprocity under the Mineral Lands Leasing Act, 30 U.S.C. § 181. Among the material covered by the subpoena were a number of Cabinet-level predecisional deliberative documents, while other documents contained classified, diplomatic information. On October 13, 1981, President Reagan directed Secretary Watt not to release 31 particular documents whose disclosure would be inconsistent with the confidential relationship among Cabinet officers and the President, and which would violate the constitutional doctrine of separation of powers. While protecting the confidentiality of these documents, Secretary Watt made repeated efforts to accommodate the Subcommittee's needs through certain limited document disclosures, testimony, and correspondence.

On February 8, 1982, a contempt resolution against Secretary Watt was passed by the Subcommittee; on February 25 the full Committee supported this conclusion by a vote of 23 to 19. By this time, however, Secretary Watt had reached a decision finding Canada to be a "reciprocal" national under the Mineral Lands Leasing Act. Immediately thereafter he informed all members of the Subcommittee that since the deliberative process had concluded, he was "hopeful" that additional documents might be released.

On March 16, 1982, Fred F. Fielding, Counsel to the President, together with members of the Subcommittee, reached an agreement pursuant to which all of the disputed documents were made available for one day at Congress under the

---

[96] Proclamation No 4744, 16 Weekly Comp. Pres. Doc. 592 (1980).
[97] Memorandum for the Attorney General, from Assistant Attorney General John Harmon, 6 (Jan. 13, 1981).
[98] *Id.* at 8.

custody of a representative from the Office of Counsel to the President. Minimal notetaking, but no photocopying, was permitted; the documents were available for examination by Members Only.[99]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[99] *See generally* H.R. Rep. No. 898, 97th Cong., 2d Sess. 73–84 (1982); *Contempt of Congress. Hearings Before the Subcomm. on Oversight and Investigations of the House Comm on Energy and Commerce.* 97th Cong., 2d Sess. (1982)